Luz María Cáez et als., Plaintiffs and Respondents, *v.* United States Casualty Company et al., Defendants and Petitioners.

No. 11705. Submitted March 1, 1956.—Decided September 24, 1958.

 

*Emilio de Aldrey* for petitioners. *Bolívar Pagán* for respondents.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.

There is no dispute as to the pertinent facts in the case at bar. In brief, they are the following: On January 18, 1951 Sixto Cáez suffered an automobile accident in the highway leading from Juncos to Gurabo, while he was traveling as a passenger in a public service automobile belonging to the defendant Luciano Méndez. The latter had it insured against risks to third persons, with the United States Casualty Co., also defendant in this suit. The accident was due solely to the fault and negligence of the driver of the vehicle, for whose acts it was admitted the owner was responsible. Due to the chauffeur's carelessness, the automobile passed over a mound of sand on the right-hand side of the highway and swerved sharply to the left while traveling at an excessive speed. For this reason one of the vehicle's doors opened and Cáez, who was seated next to it, fell out to the pavement of the highway, suffering severe contusions on the head and a deep laceration in the left temporoparietal region. He also sustained the fracture of several ribs. He was taken immediately to the Caguas Municipal Hospital, where he was confined to bed until January 31, 1951. Although he was discharged on that date, Cáez remained ill at his home without being able to work and under medical treatment. On the following February 23 he was again taken to the hospital because of continued vomiting and severe headaches. After a slight recovery, he left the hospital three days later, but on March 11, 1951 he was readmitted in a serious condition, dying a few hours later as a consequence of an extradural hematoma in the occipital region, that is, in the posterior and inferior region of the head. Said intracranial sanguineous tumor was produced by the injuries suffered by Cáez in the automobile accident. In effect, the clinical record

and the expert testimony showed (1) that the tumor was of traumatic origin; (2) that it developed slowly outside the dura mater, which is the outermost, toughest and most fibrous of the three meninges between the skull and the brain; (3) that Cáez did not suffer any other blow or contusion on the head after the accident on January 18, 1951; and (4) that the said sanguineous tumor caused Cáez' death, as is often the case, several weeks following the injury. Aside from this, defendants admit that Sixto Cáez' death occurred as a result of the accident.

However, scarcely 26 days before dying, Cáez signed a compromise with both defendants which textually copied reads as follows:

"For the present I make known that I (We) Sixto Cáez, 56 years old, widower, employed and resident of Caguas, P. R., assisted in this act by his niece, Sixta Ramírez and his attorney Lic. Francisco García Casanova. By virtue of the payment of THREE HUNDRED SEVENTY-FIVE ($375) received under this contract to my entire satisfaction, for which I issue a receipt and voucher, in form and without there existing any other consideration or promise whatever, I hereby release and forever exempt LUCIANO MÉNDEZ, COMMISSIONER OF THE INTERIOR and/or UNITED STATES CASUALTY Co. from any and every action, right of action, claim, complaint for, about or by virtue of any damage, loss, or prejudice that up to now has been or in the future may be sustained by me as a result of an automobile accident, lic. P–43338, property of Luciano Méndez and driven by José Luis Colón Avilés, occurring on January 18, 1951 on Highway No. 30, Km. 11, Hm. 1, from Juncos to Gurabo.

"Be it also agreed and understood that the payment of THREE HUNDRED SEVENTY-FIVE DOLLARS must not be interpreted as an admission on the part of LUCIANO MÉNDEZ and/or United States Casualty Company of any responsibility arising from said accident.

"In testimony whereof I have signed and certified in San Juan, Puerto Rico, today February 13, 1951.

"Signed and certified as witness the signatures of (Sgd.) SIXTO CÁEZ (signature), (Sgd.) Lic. FCO. GARCÍA CASANOVA, (Sgd.) SIXTA RAMÍREZ (signature), Caguas, Puerto Rico."

The above-mentioned compromise was made in a printed form prepared by the insurance company for that purpose. It was signed at San Juan in the offices of the adjuster of claims of the defendant company. Cáez came there, accompanied by his attorney and his niece, to stipulate the terms of a compromise that had already been discussed previously between the attorney and the adjuster. The amount to be paid, as well as the other terms of said contract, were object of wide discussion between the parties. Finally, it was agreed to compromise for the appointed sum, taking into account a medical certificate of the injuries that until then Cáez seemed to have suffered as a consequence of the accident. Although said certificate was not introduced in evidence, both parties admitted at the trial that at that moment no one was aware of the existence of the hematoma. At plain sight, Cáez was still ill from his injuries and carried a bandage on his head. On the other hand, the trial court determined that Cáez was in a fitting mental state to give his consent to the compromise and that the same was completely voluntary, that is, there was no deceit, coercion, intimidation, fraud, or undue influence on the part of the defendants.

Cáez was a widower and had four children who are the only plaintiffs in this suit.[1] They claimed compensation for the damages that their father's death caused them personally, alleging that "... *as a result of said accident, the plaintiffs have suffered serious mental anguish, have lost the companionship of their father and have lost the aid that the latter gave them and would- have given to these plaintiffs, in a sum estimated at $20,000.*" For their part, the defendants alleged before the Superior Court that the compromise held on February 13, 1951 constituted a valid defense against the action filed by Cáez' children. The lower court dismissed that allegation. Based on the facts previously set forth, it

---

[1] Two of them were of legal age and were living in New York. The other two were minors and were still attending school. They lived in Caguas with their father and two aunts that helped defray the house expenses.

entered judgment granting the complaint and ordering plaintiffs to pay the sum of $8,000 as compensation, to be distributed in equal parts between the plaintiffs. It also held that the defendant United States Casualty Company would pay the amount of $1,500, which is the maximum coverage of the policy, and that the defendant Luciano Méndez would pay the remaining sum of $6,500.

In this appeal the defendants maintain that it was an error of the court ". . . to decide that the compromise made by Sixto Cáez with Luciano Méndez' insurance company did not preclude the right of action of Cáez' children for their father's death. . . ." We believe that this assignment lacks merit.

The plaintiffs in this case only claimed the compensation for the damages that they had personally suffered as a consequence of their father's death. They made no claim for the damages suffered by the victim in the accident: that is, Sixto Cáez. In such case the action for damages rests exclusively on the provisions of § 1802 of the Civil Code (1930 ed.), 31 L.P.R.A. § 5141. Although the plaintiffs may undoubtedly join their actions in a single suit, we have rejected the theory that there only exists one common action in favor of all the persons prejudiced by the wrongful death. On the contrary, there does not exist any solidarity between the different actions arising against the person causing the wrongful death. See *Hernández* v. *Fournier, ante,* p. 94 (1957).[2] It is the private and personal damage suffered by each one of the children at the death of their father on which defendants' responsibility herein is based. Thus, the plaintiffs do not act in this suit as Cáez' heirs, albeit so they are, but in *jure proprio.* See *Travieso* v. *Del Toro,* 74 P.R.R. 940 (1953); *Vázquez* v. *People,* 76 P.R.R. 556 (1954), and *Fournier* v. *Fournier,* 78 P.R.R. 411 (1955).

[2] Plaintiffs alleged and proved in the lower court that they were Sixto Cáez' only heirs, thus complying with the remedial rule in force before our decision in *Hernández* v. *Fournier, supra.* Naturally, that allegation and that proof have now become superfluous.

 Hence the children's actions to recover material and moral damages caused by their father's death can not be mistaken with Cáez' action to obtain compensation for the damages suffered by him as a result of the accident. It does not matter that they stem from only one tortious act. In effect we are dealing with actions essentially distinct and independent because they claim reparation of different damages. We so held in *Hernández* v. *Fournier, supra,* when we said that: ". . . the damage caused by the death of a person often reflects on other persons, irrespective of the suffering that the mortal injury is inflicted on the original victim. Those whose needs were supplied by the deceased suffer damages of a patrimonial nature, as well as those who actually and effectively did not receive support from him but were entitled to receive it and, consequently, lose the well-founded and reasonable expectancy of such future benefits. On the other hand, the persons related to the deceased by blood ties or by affection and love also suffer moral damage. It matters little whether it is the case of a single tortious act. The material and moral damage caused by the unlawful death of a human being may affect several persons, and in such case each one of them acquires an independent action against the person causing the unlawful death, for the source of responsibility is precisely the particular and personal damage suffered by each one of the plaintiffs. Thus, that such claims do not stem from a hereditary right: each plaintiff claims compensation for the damage which the death personally caused him and he is not acting as an heir, even if he is so, since he is not claiming compensation for the damages suffered by the deceased."

Since the damages for which compensation could be claimed are different ones, it also becomes obvious that they do not accrue necessarily at the same time. Thus, in the case at bar, while Cáez' action arose at the moment of the accident, the children's actions arose at the time of his death. It follows then that the prescription period for said actions

might be different. In practice the date on which the victim learned of the damage, which is the starting point for prescription, depends as a general rule on the moment the damages were caused. 1 Borrell y Soler, *Derecho Civil Español* 507–529 (1955). On the other hand, since Cáez' children are not claiming as successors in interest, the father's creditors (except acceptance of the inheritance without benefit of inventory) could not have any right to the compensation awarded because it does not refer to a credit of his debtor but rather a personal right of the plaintiffs.

Summing up the foregoing, we see that our law recognizes two different and independent actions: *first*, Cáez' personal action as original victim of the accident for the damages that he suffered; and *second*, the right of action accruing exclusively, and in its own right, to each child to claim damages for his or her father's death. Having established this, and since this suit deals with actions corresponding to the children, it is obvious that the defendants can not invoke the compromise signed by Cáez on February 13, 1951 as a defense.

 Assuming that the contract of compromise included *all* the actions that arose as a result of Cáez' death, it suffices to point out that Cáez could not compromise with regard to his children's rights or actions. Our Civil Code equalizes the compromise to a final judgment which has the weight of res adjudicata with regard to the parties. Nevertheless, like in any other contract, it only produces effects between the parties and their successors in interest regarded as such. It can never bind the ones who did not intervene therein. Sections 1209 and 1715 of the Civil Code (1930 ed.), 31 L.P.R.A. §§ 3374 and 4827. On the other hand, only those having capacity to dispose of the rights contained in the compromise may compromise. In the case at bar the two Cáez children who were of legal age when the compromise was signed were not parties thereto. As to the other two children, who at that moment were minors, the

compromise becomes void because the corresponding judicial authority was not obtained as required by § 1710 of the Civil Code (1930 ed.), 31 L.P.R.A. § 4822. See 4 Castán, *Derecho Civil Español, Común y Foral* 730–745 (8th ed., 1956). Cáez could only compromise with regard to the damages that he personally suffered as a consequence of the accident. *Cf. Carrasquillo* v. *Am. Missionary Association*, 61 P.R.R. 837, 853 (1943) and *Heirs of Bachier* v. *Workmen's Relief Com.*, 33 P.R.R. 975, 976–77 (1925).

 Furthermore, a compromise entered into with the victim of an accident shortly after the latter takes place, must be interpreted restrictively. As is well-known, even in ordinary cases, the compromise ". . . shall only include the objects specifically determined therein or which from a necessary inference from its words must be considered as included therein." Section 1714 of the Civil Code (1930 ed.), 31 L.P.R.A. § 4826. *Canino* v. *Bellaflores*, 78 P.R.R. 739 (1955); 4 Castán, *op. cit. supra;* IV-II Puig Peña, *Tratado de Derecho Civil Español* (1951). It is logical that we become more strict when the victim is misinformed as to the circumstances and consequences of the accident, either because he does not realize their extent with accuracy or because the latter have not yet become manifest. We could not tolerate the exploitation of ignorance, or what is worse, of human misfortune. *Cf. De Jesús* v. *Singer Sewing Machine Co.*, 46 P.R.R. 694, 699 (1934). Thus, the compromise of February 13, 1951 shall be deemed as including only what was in controversy, that is: the foreseen consequences of the accident and those which might have been reasonably foreseen. As to the *totally unforeseen* consequences of the accident, it could not have been their common intent to include them in the contract and, therefore, they were not object of the above-mentioned compromise. It will be noted that both parties were completely unaware of the existence of the sanguineous tumor when they signed the compromise. It is not therefore a mere aggravation of the

damage what the parties took into consideration upon compromising. Cáez' death was in truth a totally unforeseen consequence of the accident. So that the damages caused by Cáez' death were not object of compromise between the parties signing the contract executed on February 13, 1951, especially when the obscurity on that point should not favor the defendants because they were the ones who presented the document to Cáez for his acceptance. *Cf.* the Judgment of the Supreme Court of Spain of March 15, 1949, 26 *Jur. Civ.* 198 (2d s.).

If based on an injury or severe permanent disability Cáez would have received compensation prior to his death, by means of a compromise or judgment, the valuation of the damage would have necessarily included the reduction of his income during life-expectancy. That is, Cáez would have obtained as compensation the indispensable capital to substitute the loss of income during the remainder of his life. In such case, the amount of material damage suffered by the plaintiffs as a result of Cáez' death would have been less, depending on the degree of disability fixed in the judgment or foreseen by the parties in the compromise. *Cf.* Prosser, *Handbook of the Law of Torts* 705–719 (2d ed., 1955); 2 Harper and James, *The Law of Torts* 1291–1295 (1956); McCormick on *Damages* 299–374 (1935); and McCormick and Fritz, *Cases and Materials on Damages* 250–376 (1952). But, since the parties were mistaken as to the *nature* of the accident, it would be tantamount to denaturalizing the meaning of the compromise if we included therein the reparation of a serious and permanent disability. We can not conclude here that the parties compromised the actions derived either from a permanent injury or from Cáez' death.

In view of the previous conclusions, it is not necessary to decide whether the compromise between Cáez and the defendants was void because of an error of essential fact that calls upon the substance or consideration of the contract, as the plaintiffs allege in their brief. See: § 1716 of

the Civil Code (1930 ed.), 31 L.P.R.A. § 4828; Moxó, *Notas sobre la Naturaleza de la Transacción*, 34 Rev. Der. Priv. 673 (1950); Sanahuja, *Consideraciones sobre la Naturaleza del Contrato de Transacción y Principales Cuestiones que Plantea*, 29 Rev. Der. Priv. 230 (1945); 11 Planiol y Ripert, *Tratado de Derecho Civil Francés* 959 *et seq.;* (sp. transl. 1940); Puig Brutau, *Fundamentos de Derecho Civil* 563–583, tome II, vol. II (1956); and Puig Peña, *op. cit. supra*, 526–529. *Cf.* Corbin, *Contracts* 356 *et seq.;* 5 Williston, *Contracts* 47 *et seq.* (rev. ed.).

The judgment appealed from will be affirmed.